Opinion filed September 11, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00155-CR

_____

### KEITH DEAN VEALE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

On Appeal from the 91st District Court

Eastland County, Texas

Trial Court Cause No. 23040

### M E M O R A N D U M   O P I N I O N

The jury convicted Appellant, Keith Dean Veale, of the offense of burglary of a habitation. The trial court assessed Appellant's punishment at confinement for thirty years, pursuant to an agreement, and sentenced him accordingly. In one issue, Appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

## I. *The Charged Offense*

Appellant was charged by indictment with the offense of burglary of a habitation under Section 30.02 of the Texas Penal Code. TEX. PENAL CODE ANN. § 30.02 (West 2011). As charged in the indictment, a person commits the offense of burglary of a habitation if, without the effective consent of the owner, the person intentionally or knowingly enters a habitation and attempts to commit or commits the felony offense of assault. *See id.* § 30.02(a)(3). The offense is a first-degree felony. *Id.* § 30.02(d).

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. *Id.* § 22.01(a)(1) (West Supp. 2013). The offense of assault is a felony if the victim is in a dating relationship with the accused and it is established that the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing of the person by blocking the person's nose or mouth. *Id.* § 22.01(b)(2)(B); *see also* TEX. FAM. CODE ANN. § 71.0021(b) (West 2014) (defining "dating relationship" as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature").

## II. *Evidence at Trial*

Georgette Wyatt testified that she began dating Appellant in the fall of 2010. Wyatt and Appellant moved in with each other at Appellant's mother's house until Wyatt purchased a home in the spring of 2011. Wyatt and Appellant lived together in Wyatt's home for a little over one year. In June 2012, Wyatt sent Appellant a letter telling him to move out. After Wyatt sent the letter, she changed the locks on her house.

On the date of the offense in December 2012, Wyatt and Appellant were together; they began the day picking up pecans and talking about their previous relationship. Later that evening, Wyatt and Appellant returned to Wyatt's house.

During supper, the two of them started to discuss their relationship, and the conversation became unpleasant for Wyatt. Wyatt asked Appellant to leave her house. At first, Appellant refused to leave, and Wyatt went into her bedroom to lie down, hoping that Appellant would leave.

According to Wyatt, Appellant came into the bedroom and told Wyatt that her house was on fire. Wyatt smelled something burning, so she got up and saw a pile of newspapers burning in the front room of her house. Wyatt quickly picked up the burning papers and threw them out the front door. Appellant then told Wyatt that he was going to paint her house next, and he retrieved a can of green paint from the front room. Appellant called Wyatt an "evil, rotten bitch." Wyatt continued to tell Appellant to leave, but he refused to leave until he had transportation. At some point, Wyatt took Appellant to his friend's house.

Later, around 10:00 or 11:00 p.m., Appellant returned to Wyatt's house. Wyatt heard her front gate open and heard Appellant knocking on the front door. Wyatt did not answer the door because Appellant had already given her a hard time earlier in the day and because Wyatt did not want to talk to Appellant anymore or have him at her house. Wyatt testified that she was afraid but did not call 911 because she did not have a phone. After Wyatt did not answer the front door, Appellant went around the house and tried to open the windows. Wyatt then heard the doorknob on the back door shaking back and forth, followed by silence. A few minutes later, while Wyatt was sitting in the front room, Appellant kicked in the front door. The State admitted a photograph that depicted the broken lock on the front door that Appellant kicked in. Wyatt testified that the lock was a bolt lock that went across the door and that, when Appellant kicked the door in, the lock ripped out of the doorjamb.

After Appellant kicked the door in, Wyatt ran into her room and tried to shut the door, but Appellant was already through it. Wyatt stated that Appellant did not

have permission to be in her home and that she told Appellant to leave more than once during the confrontation. Wyatt ran and jumped on her bed. Wyatt sat against the "backboard" of her bed, afraid, and Appellant approached her. Appellant reached down as though he was going to grab Wyatt but, instead, grabbed the pillow next to Wyatt, put it over her face, and held her down with it.

Wyatt testified that she attempted to fight back by scratching Appellant, by trying to pull his hair, and by hitting him; Wyatt could not breathe and tried anything she could to get up. Wyatt testified that she felt like she was suffocating and dying. Eventually, Wyatt quit fighting, and Appellant took the pillow off her face. Wyatt stated that she felt like she "was having another heart attack." After Appellant took the pillow off Wyatt's face, Appellant looked down at her and then called an ambulance. According to Wyatt, Appellant was able to call an ambulance with a phone that a friend left on the coffee table. Wyatt had not called 911 before because she knew the phone had no minutes left on it, and she did not know that the phone could be used to make an emergency call even if the minutes were depleted. When a police officer arrived, Wyatt immediately went outside and told him what had happened, including the fact that Appellant had tried to kill her.

On cross-examination, Wyatt stated that the only place where damage to the door occurred was to the doorjamb; she did not think that there was any damage to the strike plate on the door. In addition, Wyatt said that, when she left her room during the initial confrontation to check on the cause for the smell of smoke, the front room containing the burning newspapers was filled with smoke. Wyatt also said that, during the initial confrontation, she threatened to call the police if Appellant did not leave. According to Wyatt, she made such a threat because she did not know what else to say even though she knew she had no phone to call the police. When Appellant's trial counsel asked Wyatt what she did with the burning newspapers, Wyatt said that she left them outside on her front porch after she

4

threw them there. Wyatt indicated that the newspapers burned a large hole in the cushion of some outdoor furniture on the porch.

Bobby Lehmann, a former officer with the Ranger Police Department who was on duty at the time of the offense, testified that he was dispatched to Wyatt's residence at approximately 12:40 a.m. Officer Lehmann was responding to a 911 hang-up call. Upon his arrival, Officer Lehmann observed Wyatt and Appellant standing outside the residence, both walking toward the side gate in Officer Lehmann's direction. Wyatt approached Officer Lehmann and told him that she had been assaulted by Appellant. She stated that Appellant had placed a pillow over her head and tried to suffocate her. Appellant was standing near them while Wyatt told Officer Lehmann this, and Appellant did not say or do anything to deny the allegations.

When Officer Lehmann questioned him, Appellant told Officer Lehmann that he had been staying at the residence for a few days and that he had just started arguing with Wyatt. Appellant told Officer Lehmann that Wyatt had a supposed heart attack and that he called 911. Officer Lehmann observed several scratches on both sides of Appellant's face, which looked like physical scratches with red marks, along with a little bit of blood. Appellant claimed that he had cut himself shaving. Officer Lehmann testified that, based on his experience with shaving, it did not appear at all that Appellant had cut himself with a razor.

Officer Lehmann then returned to Wyatt, who told him that she and Appellant had gotten into an argument and that she had asked Appellant to leave multiple times. Wyatt told Officer Lehmann that Appellant refused to leave but, instead, tried to smother her with a pillow. The State showed Officer Lehmann the photograph of the bolt lock in State's Exhibit No. 1, and Officer Lehmann indicated that he took the photograph and that it depicted visible damage to the door strike.

5

After examining the scene and speaking with Wyatt, Officer Lehmann informed Appellant that he would be placed under arrest. Appellant stood up and became agitated. Officer Lehmann ordered Appellant three times to turn around, but Appellant did not comply; an altercation ensued. Officer Lehmann called for backup, and Appellant physically pushed Officer Lehmann. Officer Lehmann testified that the physical push was forceful and assaultive. Officer Lehmann then pepper-sprayed Appellant, and Appellant took off and ran inside the house. Officer Lehmann drew his weapon and commanded Appellant to stop, but Appellant then ran out the back door and jumped the neighbor's fence. The officers were unable to find him that night. Officer Lehmann testified that, based on his training and experience, he believed that Appellant was trying to get away from something that he had done.

On cross-examination, Officer Lehmann testified that he did not observe any damage to the door or its frame other than the door strike for the bolt that he had earlier indicated was damaged. Officer Lehmann did not observe any footprints on the door. Officer Lehmann did not see any burned newspapers on the front porch, did not smell any smoke in the house, and did not see a burned cushion on the front porch. Officer Lehmann said that Wyatt had told him about the fire incident, but Officer Lehmann did not put the incident into his report because it did not occur around the time of the alleged burglary and assault. Officer Lehmann took a picture of the pillow that was allegedly used to suffocate Wyatt, but he did not inspect the pillow for any signs of bodily fluids. Officer Lehmann said that he did not observe any physical markings on Wyatt when he questioned her, but Officer Lehmann said that Wyatt was extremely frightened and was trying to get away from Appellant. Officer Lehmann also said that Wyatt's breathing rate was rather high.

6

### III. *Issue Presented*

Appellant contends in his sole issue that the evidence was insufficient to support his conviction.

### IV. *Standard of Review*

We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the jury's role as the sole judge of the witnesses' credibility and the weight their testimony is afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

### V. *Analysis*

Appellant asserts that key components of the alleged victim's testimony regarding ancillary acts and direct acts by Appellant on the day of the alleged offense were not corroborated by the testimony of the responding officer. Specifically, Appellant points to the following four claims made by Wyatt: (1) that Appellant set fire to newspapers in her front room during the initial confrontation; (2) that Appellant threatened to paint the house green if Wyatt continued to insist

that Appellant leave the house during the initial confrontation; (3) that a chair cushion on the front porch was burned by the newspapers after Wyatt threw them out of the house; and (4) that Appellant kicked the door in during the second confrontation, which led to the charges in this case. According to Appellant, this lack of evidence calls into question whether Appellant entered the habitation without Wyatt's effective consent and whether Appellant committed felony assault.

We have reviewed the entire record according to the *Jackson* standard, and we conclude that the evidence was sufficient to support Appellant's conviction for burglary of a habitation. It was undisputed that Appellant and Wyatt had been in a "dating relationship." *See* FAM. § 71.0021(b). Wyatt's testimony established that Appellant forcefully entered her home without consent. Upon Appellant's entry, Wyatt told him to leave, but Appellant followed Wyatt into her room and placed a pillow over Wyatt's face, covering her nose and mouth. Wyatt testified that she feared for her life and felt like she was suffocating, could not breathe, and could have a heart attack. Under these facts, a rational jury could have concluded beyond a reasonable doubt that Appellant committed all the elements of burglary of a habitation with the commission of felony assault. *See* PENAL §§ 22.01, 30.02(a)(3).

Although Wyatt's testimony may have been called into question, her credibility was an issue for the jury to decide. *See Taylor v. State*, 279 S.W.3d 818, 822–23 (Tex. App.—Eastland 2008, pet. ref'd). Moreover, many of the facts that were uncorroborated by Officer Lehmann were not denied outright; Officer Lehmann merely testified that he did not observe any evidence of a fire, the presence of green paint, broken pieces of the doorjamb, or footprints on the front door. Given that many of the facts that were not corroborated by Officer Lehmann were not directly related to the factual support behind the elements of the offense,

8

we cannot conclude that Wyatt's credibility was so questioned that no rational trier of fact could have believed her testimony as it related to the elements of the offense.

Viewing all the evidence in the light most favorable to the verdict and giving proper deference to the jury's credibility determinations, we conclude that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We overrule Appellant's sole issue.

### VI. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

September 11, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and McCall.[1]

Bailey, J., not participating.

---

[1]Terry McCall, Retired Justice, Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.